**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| IELIOT JACKSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) No. **20-5886** | |
| | ) | |
| CITY OF CHICAGO, CLARK EICHMAN, | ) | |
| MICHAEL SANTOS, PETER FLEMING, | ) | |
| CHARLIE PERSON, ORLANDO CALVO, | ) | |
| JOHN DAL PORTE, J.W. BOISSO | ) | |
| AND P. WILLIAMS, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff, Ieliot Jackson, by and through counsel, the Law Office of Jarrett Adams PLLC,

complains against Defendants, City of Chicago, Clark Eichman, Michael Santos, Peter Fleming,

Charlie Person, Orlando Calvo, John Dal Ponte, J.W. Boisso and P. Williams, as follows:

### INTRODUCTION

1.       This is a federal civil rights action brought by Ieliot Jackson to obtain

compensatory damages, punitive damages, costs and attorneys' fees for the false arrest of Mr.

Jackson by members of the City of Chicago Police Department ("CPD") on June 24, 2009, for

the concealment of exculpatory evidence by CPD members, and for the use of evidence

fabricated by CPD members against Mr. Jackson at a criminal trial on July 14, 2010, resulting in

Mr. Jackson being held in custody in violation of his constitutional rights under the Fourth and

Fourteenth Amendments for almost seven years. This action also seeks injunctive and equitable

relief against the City of Chicago to reform the unconstitutional policies and customs that were

the moving force behind the constitutional rights violations suffered by Mr. Jackson.

## JURISDICTION

2.      This action is brought under 42 U.S.C. § 1983 to address the deprivation under color of law of Mr. Jackson's rights as secured by the United States Constitution and under state law.

3.      The Court has jurisdiction over Mr. Jackson's federal claims pursuant to 28 U.S.C. §§ 1331 and 1343, and has supplemental jurisdiction over Mr. Jackson's state law claims pursuant to 28 U.S.C. § 1367.

4.      Venue is proper under 28 U.S.C. § 1391(b) because the Northern District of Illinois is the judicial district where the constitutional rights violations suffered by Mr. Jackson occurred.

## PARTIES

5.      Plaintiff, Ieliot Jackson, is a citizen of the United States of America, who at all times relevant resided in Illinois.

6.      Defendant, City of Chicago ("Defendant Chicago"), is a political subdivision of the State of Illinois. At all relevant times, Defendant Chicago was the principal and employer of the individual Defendants who acted pursuant to Defendant Chicago's policies and customs. As the employer of the individual Defendants, Defendant Chicago is liable for their torts under Illinois law and the doctrine of *respondeat superior*.

7.      Defendant, Clark Eichman ("Defendant Eichman"), at all relevant times, was an adult resident of the State of Illinois, and was a CPD officer employed by Defendant Chicago. At all relevant times, Defendant Eichman was acting under color of law, was carrying out his duties as a CPD officer, and was acting within the scope of his employment with Defendant Chicago.

8.     Defendant, Michael Santos ("Defendant Santos"), at all relevant times, was an adult resident of the State of Illinois, and was a CPD sergeant employed by Defendant Chicago. At all relevant times, Defendant Santos was acting under color of law, was carrying out his duties as a CPD sergeant, and was acting within the scope of his employment with Defendant Chicago.

9.     Defendant, Peter Fleming ("Defendant Fleming"), at all relevant times, was an adult resident of the State of Illinois, and was a CPD officer employed by Defendant Chicago. At all relevant times, Defendant Fleming was acting under color of law, was carrying out his duties as a CPD officer, and was acting within the scope of his employment with Defendant Chicago.

10.     Defendant, Charlie Person ("Defendant Person"), at all relevant times, was an adult resident of the State of Illinois, and was a CPD officer employed by Defendant Chicago. At all relevant times, Defendant Person was acting under color of law, was carrying out his duties as a CPD officer, and was acting within the scope of his employment with Defendant Chicago.

11.     Defendant, Orlando Calvo ("Defendant Calvo"), at all relevant times, was an adult resident of the State of Illinois, and was a CPD officer employed by Defendant Chicago. At all relevant times, Defendant Calvo was acting under color of law, was carrying out his duties as a CPD officer, and was acting within the scope of his employment with Defendant Chicago.

12.     Defendant, John Dal Ponte ("Defendant Dal Ponte"), at all relevant times, was an adult resident of the State of Illinois, and was a CPD officer employed by Defendant Chicago. At all relevant times, Defendant Dal Ponte was acting under color of law, was carrying out his duties as a CPD officer, and was acting within the scope of his employment with Defendant Chicago.

13.     Defendant, J.W. Boisso ("Defendant Boisso"), at all relevant times, was an adult resident of the State of Illinois, and was a CPD supervisor employed by Defendant Chicago. At all relevant times, Defendant Boisso was acting under color of law, was carrying out his duties as a CPD supervisor, and was acting within the scope of his employment with Defendant Chicago.

14.     Defendant, P. Williams ("Defendant Williams"), at all relevant times, was an adult resident of the State of Illinois, and was a CPD officer employed by Defendant Chicago. At all relevant times, Defendant Williams was acting under color of law, was carrying out his duties as a CPD officer, and was acting within the scope of his employment with Defendant Chicago.

**FACTS**

**Facts Pertaining to the False Arrest of, the Concealment of Exculpatory Evidence from, and the Use of Fabricated Evidence against Ieliot Jackson**

15.     On June 24, 2009, Defendant Calvo and Defendant Dal Ponte falsely arrested Mr. Jackson for allegedly selling heroin to undercover CPD officers on June 4, 2009, June 11, 2009, June 13, 2009 and June 17, 2009.

16.     Defendant Fleming was the undercover CPD officer who allegedly purchased heroin from Mr. Jackson on June 4, 2009, June 11, 2009 and June 17, 2009.

17.     Defendant Eichman was the undercover CPD officer who allegedly purchased heroin from Mr. Jackson on June 13, 2009.

18.     Defendant Williams was involved in the arrest of Mr. Jackson on June 24, 2009.

19.     Defendant Boisso approved the arrest of Mr. Jackson on June 24, 2009.

20.     Mr. Jackson did not sell drugs to anyone on June 4, 2009, June 11, 2009, June 13, 2009 and June 17, 2009.

21.     There was neither probable cause nor reasonable suspicion to believe that Mr. Jackson sold drugs to anyone on June 4, 2009, June 11, 2009, June 13, 2009 and June 17, 2009.

4

22.     Mr. Jackson was acquitted in a prior drug case involving CPD officers.

23.     Mr. Jackson was acquitted in a prior case for first degree murder involving CPD officers.

24.     Upon information and belief, Mr. Jackson was falsely arrested on June 24, 2009 in retaliation for being acquitted in prior criminal cases involving CPD officers.

25.     The Cook County, Illinois State's Attorney elected to try Mr. Jackson for the alleged June 13, 2009 heroin sale to Defendant Eichman.

26.     The trial against Mr. Jackson for the alleged June 13, 2009 heroin sale occurred from July 13, 2010 to July 14, 2010.

27.     The facts pertaining to the alleged June 13, 2009 heroin sale by Mr. Jackson to Defendant Eichman actually begin on May 30, 2009.

28.     On May 30, 2009, while working as an undercover narcotics officer with the CPD, Defendant Eichman met with a person on a BMX bicycle in the area near the 4800 block of West Superior in Chicago, Illinois.

29.     Defendant Eichman had a conversation with the person on the BMX bicycle that consisted of the person asking for Defendant Eichman's name and phone number.

30.      In response, Defendant Eichman told the person on the BMX bicycle that his name was "Ike," and gave the person his personal cell phone number.

31.     A short time after Defendant Eichman gave the person on the BMX bicycle his name and personal cell phone number, and while he was in the process of driving away from the person, Defendant Eichman's phone rang, and he recognized the caller as the person with whom he had just spoken.

5

32.     The person on the BMX bicycle told Defendant Eichman that he could call the person if he needed "something," which Defendant Eichman understood to mean drugs.

33.     Defendant Eichman entered the person's telephone number into his personal cell phone as "BMX."

34.      Despite the fact that there was a method for listening into further conversations with a potential criminal and therefore formally connecting a phone with a given individual, this was not done at any time for the person Defendant Eichman identified as "BMX" in the two weeks between May 30, 2009 and June 13, 2009.

35.     Defendant Eichman also had contact with Mr. Jackson on May 30, 2009 in the area of the 4800 block of West Superior in Chicago, Illinois, but Mr. Jackson was not riding a BMX bicycle, and Mr. Jackson did not provide Defendant Eichman with his telephone nor did he have a telephone conversation with Defendant Eichman.

36.     Then on June 13, 2009, Defendant Eichman received a call on his personal cell phone from the person he identified as "BMX" on May 30, 2009.

37.     During the call, Defendant Eichman arranged a purchase of heroin with the person identified as "BMX."

38.     The person identified as "BMX" sold heroin to Defendant Eichman on the 4800 block of West Superior on June 13, 2009.

39.     Also present for the June 13, 2009 heroin sale between the person identified as "BMX" and Defendant Eichman were Defendant Santos, Defendant Person, Defendant Fleming, Defendant Williams and Defendant Calvo.

40.     Defendant Person and Defendant Santos were the surveillance officers for Defendant Eichman's heroin purchase from the person identified as "BMX" on June 13, 2009, but did not use any audio or video recording, and did not take any pictures.

41.     Following the heroin purchase on June 13, 2009 from the person identified as "BMX," Defendant Eichman returned to the Homan Square CPD station and falsely identified Mr. Jackson as the person who sold him heroin on June 13, 2009 from an array of five photos which only showed the individuals' heads and a small portion of their upper bodies.

42.     Defendant Eichman falsely identified Mr. Jackson as the person who sold him heroin on June 13, 2009 on the photo array by circling Mr. Jackson's photo and writing his initials "CWE" under Mr. Jackson's photo.

43.     Defendant Eichman knew that he falsely identified Mr. Jackson as the person who sold him heroin on June 13, 2009 on the photo array when he circled Mr. Jackson's photo and wrote his initials "CWE" under Mr. Jackson's photo.

44.     The photo array where Defendant Eichman falsely identified Mr. Jackson as the person who sold him heroin on June 13, 2009 was created by Defendant Santos.

45.     The photo array where Defendant Eichman falsely identified Mr. Jackson as the person who sold him heroin on June 13, 2009 showed a number of men with facial hair, but of all the array participants, only Mr. Jackson had a distinctive beard.

46.     Upon information and belief, Defendant Fleming falsely identified Mr. Jackson as the person who sold him heroin on June 4, 2009, June 11, 2009 and June 17, 2009 from a photo array in the same manner as Defendant Eichman identified Mr. Jackson as the person who sold him heroin on June 13, 2009.

47.     The photo array where Defendant Eichman falsely identified Mr. Jackson as the person who sold him heroin on June 13, 2009 was admitted into evidence at Mr. Jackson's trial on the alleged June 13, 2009 heroin purchase.

48.     Defendant Eichman testified at Mr. Jackson's trial for the alleged June 13, 2009 heroin purchase that he identified the person on June 13, 2009 as the same person he identified as "BMX" on May 30, 2009 because of the person's beard, and not from the person's age, height, weight, skin tone, haircut or any other distinguishing characteristics.

49.     At trial of Mr. Jackson for the alleged June 13, 2009 heroin purchase, Defendant Person falsely identified Mr. Jackson as the person who sold heroin to Defendant Eichman.

50.     Neither Defendant Eichman's personal cell phone nor Mr. Jackson's cell phone were admitted into evidence at Mr. Jackson's trial on the alleged June 13, 2009 heroin purchase.

51.     No DNA, fingerprints, phone records, voice recognition or any other independent evidence were admitted into evidence at Mr. Jackson's trial on the alleged June 13, 2009 heroin purchase.

52.     On May 30, 2009, Isaac Williams had a beard, rode a BMX bicycle, and spoke to Defendant Eichman in the area of the 4800 block of West Superior.

53.     On May 30, 2009, Mr. Williams asked Defendant Eichman for his name and telephone number.

54.     On May 30, 2009, Defendant Eichman told Mr. Williams that his name was "Ike," and gave Mr. Williams his personal cell phone number.

55.     On May 30, 2009, Mr. Williams called Defendant Eichman and told him to call if he needed "anything," by which Mr. Williams meant drugs.

8

56.     On June 13, 2009, Mr. Williams called Defendant Eichman on his personal cell phone and arranged a heroin purchase in the 4800 block of West Superior.

57.     On June 13, 2009, Mr. Williams sold heroin to Defendant Eichman in the 4800 block of West Superior.

58.     Mr. Williams does not look like Mr. Jackson, is ten years older, is six inches shorter and in May and June of 2009 was 50 pounds lighter than Mr. Jackson.

59.     In May and June 2009, both Mr. Williams and Mr. Jackson had distinctive Egyptian-style goatee beards.

60.     Neither Defendant Eichman nor Defendant Person was shown a photo array involving Mr. Williams.

61.     On July 14, 2010, Mr. Jackson was convicted of Delivery of a Controlled Substance within 1,000 Feet of Real Property Compromising a School contrary to 720 ILCS 570/407(b)(2) for the alleged heroin sale to Defendant Eichman on June 13, 2009.

62.     Mr. Jackson was sentenced to 13 years in prison.

63.     Mr. Jackson remained in custody from the date of his arrest on June 24, 2009 until he was released on parole on March 16, 2016.

64.     Mr. Jackson did not sell heroin to Defendant Eichman on June 13, 2009 in the 4800 block of West Superior.

65.     Mr. Williams in fact sold heroin to Defendant Eichman on June 13, 2009 in the 4800 block of West Superior.

66.     A contact card, which was approved by Defendant Santos, was created for Defendant Eichman's contact with Mr. Williams on May 30, 2009.

67. The contact card for Defendant Eichman's contact with Mr. Williams on May 30, 2009 noted that Mr. Williams was "on bike."

68. Upon information and belief, the individual Defendants knowingly concealed from the Cook County, Illinois State's Attorney the exculpatory evidence that Mr. Williams sold heroin to Defendant Eichman on June 13, 2009 in the 4800 block of West Superior.

69. The exculpatory evidence that Mr. Williams sold heroin to Defendant Eichman on June 13, 2009 in the 4800 block of West Superior was not available to Mr. Jackson, through the exercise of reasonable diligence, to make use of at his criminal trial for the alleged June 13, 2009 heroin sale to Defendant Eichman.

70. On September 20, 2018, following an appeal process, Mr. Jackson's conviction for the alleged June 13, 2009 heroin sale to Defendant Eichman was overturned and his motion for a new trial was granted.

71. On October 18, 2018, the Cook County, Illinois State's Attorney gave formal notice that it would not prosecute Mr. Jackson for the alleged June 13, 2009 heroin sale to Defendant Eichman, and the case against Mr. Jackson was dismissed.

72. The conduct of Defendant Eichman, Defendant Santos, Defendant Fleming, Defendant Person, Defendant Calvo, Defendant Dal Ponte, Defendant Boisso and Defendant Williams, as set forth in the preceding paragraphs, resulted in damages and injuries to Mr. Jackson, including but not limited to loss of liberty, physical injury and sickness, and emotional pain and suffering.

73. The conduct of Defendant Eichman, Defendant Santos, Defendant Fleming, Defendant Person, Defendant Calvo, Defendant Dal Ponte, Defendant Boisso and Defendant

Williams, as set forth in the preceding paragraphs, was the proximate cause of Mr. Jackson's damages and injuries.

74.     The conduct of Defendant Eichman, Defendant Santos, Defendant Fleming, Defendant Person, Defendant Calvo, Defendant Dal Ponte, Defendant Boisso and Defendant Williams, as set forth in the preceding paragraphs, was objectively unreasonable, intentional, purposeful and/or knowing, and was undertaken with malice and/or reckless disregard of Mr. Jackson's constitutional rights.

**Facts Pertaining to Defendant Chicago's Unconstitutional Policies and Customs**

*Facts Pertaining to Defendant Chicago's Policies and Customs of Failing to Train, Supervise and Discipline CPD Officers*

75.     Defendant Chicago's policies and customs were the moving force behind the misconduct set forth above by CPD members by failing to adequately train, supervise, investigate, punish and discipline prior instances of similar misconduct by CPD officers, thereby leading CPD officers to believe their actions will never be scrutinized and, in that way, directly encouraging future constitutional violations such as those suffered by Mr. Jackson.

76.     Defendant Chicago's policymakers have long been aware of the policies and customs of failing to train, supervise, investigate and discipline misconduct by CPD officers, but have failed to take actions to remedy the problems.

77.     In June 2000, the Chairman of the Committee on Police and Fire of the Chicago City Council submitted an official resolution recognizing that "[Chicago] police officers who do not carry out their responsibilities in a professional manner have ample reason to believe that they will not be held accountable, even in instances of egregious misconduct."

78.     In 2001, the Justice Coalition of Greater Chicago ("JCGC"), a coalition of more than a hundred community groups, confirmed the findings of that resolution, concluding that the

CPD lacked many of the basic tools necessary to identify, monitor, punish and prevent police misconduct. The JCGC findings were presented to Chicago Mayor Daley, CPD Superintendent Hillard, and the Chicago Police Board.

79.     Despite Defendant Chicago's policymakers' knowledge of the policies and customs of failing to adequately investigate, discipline, and control CPD officers, nothing was done to remedy these problems.

80.     As a result, the CPD has continued to respond to complaints of police misconduct inadequately and with undue delay, and to recommend discipline in a disproportionately small number of cases.

81.     Over 99% of the time when a citizen complains that his or her civil rights were violated by CPD officers, Defendant Chicago sides with the officer and concludes that no violation occurred.

82.     For example, in 2005, at least 1,592 complaints of civil rights violations were lodged against CPD officers with the CPD's Internal Affairs Division. A total of 5 were sustained, and that total may include cases arising in previous years.

83.     In 2006, the number of civil rights complaints against CPD officers was 1,492, and only 12 were sustained.

84.     From 2011 to 2012, less than four percent of complaints against CPD officers were sustained.

85.     Defendant Chicago's investigation of citizen complaints against CPD officers is inadequate and is characterized by unreasonably long delays, despite the relative straight-forward nature of many misconduct claims.

86.     Defendant Chicago also has failed to modify its CPD officer training programs to reduce misconduct or to implement a system to identify and track repeat offenders, districts, or units.

87.     In the case of *Obryka v. City of Chicago et al.*, No. 07-CV-2372 (N.D. Ill.) (the Abbate case), a jury found that as of February 2007 "the City [of Chicago] had a widespread custom and/or practice of failing to investigate and/or discipline its officers and/or code of silence."

88.     In December 2015, Defendant Chicago Mayor Rahm Emanuel acknowledged that a code of silence exists within the CPD that encourages cover-ups of police misconduct, and that Defendant Chicago's attempts to deal with police abuse and corruption have never been adequate.

89.     In 2017, the United States Department of Justice Civil Rights Division and the United States Attorney's Office for the Northern District of Illinois issued a Report titled "Investigating the Chicago Police Department" ("the DOJ Report"). The DOJ Report is incorporated herein by reference, including but not limited to the following subsequent paragraphs.

90.     The DOJ Report found that Defendant Chicago has deficient accountability systems which contribute to the pattern or practice of CPD officer misconduct.

91.     The DOJ Report found that Defendant Chicago fails to adequately train investigators to investigate CPD officer misconduct.

92.     The DOJ Report found that a code of silence exists within the CPD, where CPD officers do not report the misconduct of fellow officers and/or lie about the misconduct of fellow officers.

93.     The DOJ Report found that Defendant Chicago's system for discipline of CPD officers for misconduct lacks integrity and does not deter misconduct.

94.     The DOJ Report found that the CPD does not provide its officers with adequate training and supervision to ensure lawful policing.

95.     The DOJ Report noted that Defendant Chicago acknowledged problems in the training of CPD officers.

96.     The DOJ Report found that the CPD does not provide supervisors with the incentive or opportunity to guide and direct its officers, or to hold its officers accountable for misconduct.

97.     The DOJ Report found that the CPD does not adequately train its supervisors to provide meaningful supervision.

98.     The DOJ Report found that CPD supervisors are not held accountable for failing to report CPD officer misconduct.

99.     Upon information and belief, Defendant Chicago's policies and customs of failing to provide adequate training, supervision and discipline to CPD officers continue to this day.

100.    Upon information and belief, the code of silence within the CPD continues to this day.

*Facts Pertaining to Defendant Chicago's Policies and Customs of Condoning CPD Officers Concealing Exculpatory Evidence and Fabricating Evidence in Drug Cases*

101.    The misconduct set forth above by the individual Defendant CPD members was undertaken pursuant to the policies and customs of Defendant Chicago of pursuing convictions in reckless disregard of the truth by condoning CPD officers concealing exculpatory evidence and fabricating evidence in drug cases.

102.    In 2019, numerous Plaintiffs brought federal civil rights actions against Defendant Chicago, former CPD Sergeant Ronald Watts and several other CPD members for concealing and fabricating evidence in drug cases ("the Watts actions"). The allegations of the Watts actions are incorporated herein by reference, including but not limited to the following subsequent paragraphs.

103.    Defendant Chicago knew that CPD officers engaged in a pattern of concealing and fabricating evidence in drug cases, which was facilitated by the CPD's code of silence.

104.    Defendant Chicago took no action to prevent CPD officers from engaging in a pattern of concealing and fabricating evidence in drug cases.

105.    Defendant Chicago has been aware since at least 1999 about its policies of failing to adequately train, supervise and discipline CPD officers for misconduct, but has failed to fix the problem.

106.    In 2020, Micaela Cruz brought a federal civil rights action against Defendant Chicago and several CPD members alleging a long-standing pattern of CPD officers fabricating evidence, concealing exculpatory evidence and conducting false arrests ("the Cruz Action"). The allegations of the Cruz action are incorporated herein by reference, including but not limited to the following subsequent paragraphs.

107.    In 2016, the President of the CPD officers' union admitted that there was a code of silence within the CPD.

108.    Since 1986, there have been more than 100 cases where CPD officers fabricated evidence and/or concealed exculpatory evidence to cause the false arrest and subsequent convictions of innocent individuals.

109.    Defendant Chicago and its policymakers had actual knowledge of the long-standing pattern of CPD officers fabricating evidence, concealing exculpatory evidence and conducting false arrests, yet took no action to remedy the problems.

110.    Defendant Chicago and its policymakers approved the policies and customs of condoning CPD officers concealing exculpatory evidence and fabricating evidence, and were deliberately indifferent to the resulting constitutional violations.

111.    Upon information and belief, Defendant Chicago's policies and customs of condoning CPD officers concealing exculpatory evidence and fabricating evidence continue to this day.

## CAUSES OF ACTION

**COUNT I:  42 U.S.C. § 1983 – False Arrest Against Defendant Eichman, Defendant Fleming, Defendant Calvo, Defendant Dal Ponte, Defendant Williams and Defendant Boisso**

112.    Mr. Jackson hereby re-alleges and incorporates by reference each of the preceding paragraphs as if fully restated herein.

113.    The above-named individual Defendants arrested Mr. Jackson on June 24, 2009.

114.    The above-named individual Defendants did not have probable cause to arrest Mr. Jackson.

115.    The above-named individual Defendants acted under of color of law.

116.    The false arrest of Mr. Jackson by the above-named individual Defendants resulted in damages and injuries to Mr. Jackson.

117.    The false arrest of Mr. Jackson was undertaken pursuant to the policies and customs of Defendant Chicago and its policymakers, as set forth above.

**COUNT II: 42 U.S.C. § 1983 – Due Process/Fair Trial: Concealment of Exculpatory Evidence/Fabrication of Evidence**
**Against Defendant Eichman, Defendant Santos, Defendant Fleming, Defendant Person, Defendant Calvo, Defendant Dal Ponte, Defendant Boisso and Defendant Williams**

118.    Mr. Jackson hereby re-alleges and incorporates by reference each of the preceding paragraphs as if fully restated herein.

119.    Defendant Eichmann and Defendant Santos knowingly fabricated evidence that was used against Mr. Jackson at his criminal trial.

120.    The evidence fabricated by Defendant Eichman and Defendant Santos was material.

121.    Upon information and belief, the above-named individual Defendants knowingly concealed exculpatory evidence from the Cook County, Illinois State's Attorney.

122.    The evidence concealed by the above-named individual Defendants was not otherwise available to Mr. Jackson, through the exercise of reasonable diligence, to make use of at his criminal trial.

123.    The evidence concealed by the above-named individual Defendants was material.

124.    The above-named individual Defendants acted under color of law.

125.    The fabrication of evidence by Defendant Eichman and Defendant Santos, and the concealment of exculpatory evidence by the above-named individual Defendants, resulted in damages and injuries to Mr. Jackson.

126.    The fabrication of evidence and the concealment of exculpatory evidence against Mr. Jackson were undertaken pursuant to the policies and customs of Defendant Chicago and its policymakers, as set forth above.

17

**COUNT III:  42 U.S.C. § 1983 – Conspiracy**
**Against Defendant Eichman, Defendant Santos, Defendant Fleming, Defendant Person,**
**Defendant Calvo, Defendant Dal Ponte, Defendant Boisso and Defendant Williams**

127.     Mr. Jackson hereby re-alleges and incorporates by reference each of the preceding paragraphs as if fully restated herein.

128.     The above-named individual Defendants had an express or implied agreement to deprive Mr. Jackson of his constitutional rights.

129.     In furtherance of this agreement, Mr. Jackson was falsely arrested, exculpatory evidence was concealed from the Cook County, Illinois State's Attorney, and fabricated evidence was used against Mr. Jackson at his criminal trial.

130.     The above-named individual Defendants acted under color of law.

131.     The conspiracy to deprive Mr. Jackson of his constitutional rights resulted in damages and injuries to Mr. Jackson.

132.     The conspiracy to deprive Mr. Jackson of his constitutional rights was undertaken pursuant to the policies and customs of Defendant Chicago and its policymakers, as set forth above.

**COUNT IV:  42 U.S.C. § 1983 – Failure to Intervene**
**Against Defendant Eichman, Defendant Santos, Defendant Fleming, Defendant Person,**
**Defendant Calvo, Defendant Dal Ponte, Defendant Boisso and Defendant Williams**

133.     Mr. Jackson hereby re-alleges and incorporates by reference each of the preceding paragraphs as if fully restated herein.

134.     As set forth above, the above-named individual Defendants falsely arrested Mr. Jackson, concealed exculpatory evidence from the Cook County, Illinois State's Attorney, and fabricated evidence that was used against Mr. Jackson at his criminal trial.

135.     Each above-named individual Defendant knew that Mr. Jackson was about to be falsely arrested, that exculpatory evidence was about to be concealed from the Cook County, Illinois State's Attorney, and that fabricated evidence was about to be used against Mr. Jackson at his criminal trial.

136.     Each above-named individual Defendant had a realistic opportunity to prevent harm from occurring.

137.     Each above-named individual Defendant failed to take reasonable steps to prevent harm from occurring.

138.     Each above-named individual Defendant acted under color of law.

139.     Each above-named individual Defendant's failure to act caused Mr. Jackson to suffer harm.

140.     The failure to intervene to prevent the constitutional violations suffered by Mr. Jackson was undertaken pursuant to the policies and customs of Defendant Chicago and its policymakers, as set forth above.

## COUNT V:  42 U.S.C. § 1983 – Failure to Train, Supervise and Discipline
## Against Defendant Chicago

141.     Mr. Jackson hereby re-alleges and incorporates by reference each of the preceding paragraphs as if fully restated herein.

142.     Defendant Chicago's training program was not adequate to train CPD supervisors and officers to properly handle recurring situations.

143.     Defendant Chicago failed to adequately supervise and discipline CPD officers.

144.     Defendant Chicago's policymakers knew that it was highly predictable that exculpatory evidence would be concealed, evidence would be fabricated, and false arrests would occur without more or different training and/or without adequate supervision and discipline of

CPD officers, because there was a pattern of similar constitutional violations and because it was highly predictable even without a pattern of similar constitutional violations.

145.    Defendant Chicago's failure to provide adequate training, supervision and discipline of CPD supervisors and officers caused the violations of Mr. Jackson's constitutional rights set forth above.

## COUNT VI:  42 U.S.C. § 1983 – Policy and/or Custom of Condoning the Concealment of Exculpatory Evidence and the Fabrication of Evidence
### Against Defendant Chicago

146.    Mr. Jackson hereby re-alleges and incorporates by reference each of the preceding paragraphs as if fully restated herein.

147.    As set forth above, Mr. Jackson was falsely arrested, exculpatory evidence was concealed from the Cook County, Illinois State's Attorney, and fabricated evidence was used against Mr. Jackson at his criminal trial.

148.    At all relevant times, Defendant Chicago had a policy and/or custom of condoning the concealment of exculpatory evidence and the fabrication of evidence by CPD officers.

149.    Defendant Chicago's policy and custom described in the preceding paragraph caused the false arrest of Mr. Jackson, the concealment of exculpatory evidence from the Cook County, Illinois State's Attorney, and the use of fabricated evidence against Mr. Jackson at his criminal trial.

## COUNT VII:  Illinois State Law – *Resondeat Superior*
### Against Defendant Chicago

150.    Mr. Jackson hereby re-alleges and incorporates by reference each of the preceding paragraphs as if fully restated herein.

151.    In committing the acts and omissions set forth above, the individual Defendant

CPD members were employees and agents of Defendant Chicago, acting at all relevant times

within the scope of their employment with Defendant Chicago.

152.    Defendant Chicago is liable as principal for all torts committed by its agents.

### COUNT VIII:  Illinois State Law – Indemnification
### Against Defendant Chicago

153.    Mr. Jackson hereby re-alleges and incorporates by reference each of the preceding

paragraphs as if fully restated herein.

154.    Illinois law requires public entities to pay any tort judgment for compensatory

damages against employees while acting within the scope of their employment.

155.    The individual Defendant CPD members were employees of Defendant Chicago,

acting at all relevant times within the scope of their employment.

Wherefore the Plaintiff, Ieliot Jackson, respectfully requests that the Court enter judgment

in his favor and against Defendants, City of Chicago, Clark Eichman, Michael Santos, Peter

Fleming, Charlie Person, Orlando Calvo, John Dal Ponte, J.W. Boisso and P. Williams, awarding

compensatory damages, costs, and attorneys' fees against each Defendant, along with punitive

damages against each of the individual Defendants, injunctive and equitable relief against

Defendant, City of Chicago, as well as any other relief the Court deems appropriate.

**PLAINTIFF DEMANDS TRIAL BY JURY.**

Respectfully Submitted,
**IELIOT JACKSON**

*Jarrett Adams*
By:  Jarrett Adams, Esq.
*Attorney for Plaintiff Ieliot Jackson*
THE LAW OFFICE OF JARRETT ADAMS, PLLC
40 Fulton Street, Floor 23
New York, NY 10038
(646) 880-9707
jadams@jarrettadamslaw.com

21