**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

Ieliot Jackson,

        Plaintiff,

        v.

City of Chicago, *et al.*,

        Defendants.

Case No. 20 C 5886

Judge Jorge L. Alonso

## Memorandum Opinion and Order

Before the Court are two motions for summary judgment: one filed by Defendant City of Chicago and another filed by Defendants Clark Eichman, Michael Santos, Peter Fleming, Orlando Calvo, Charlie Person, and John Dal Ponte's (the "Individual Defendants"). For the following reasons, the Court grants in part and denies in part each motion.

## Background

In this civil rights action brought under 42 U.S.C. § 1983, Plaintiff Ieliot Jackson alleges that one or more of the Individual Defendants violated his constitutional rights by falsely arresting him, fabricating evidence used against him at trial, suppressing exculpatory evidence, and conspiring to violate his constitutional rights. The Individual Defendants now move for summary judgment in their favor on all claims against them.

Jackson also alleges that the City of Chicago failed to discipline its police officers, condoned the concealing and fabrication of evidence, and is liable under *respondeat superior* and indemnification theories. The City moves for summary judgment as to Jackson's *respondeat superior* and indemnification claims.

## I. Evidentiary Issues

As an initial matter, in disputing many of the Individual Defendants' statements of fact and supporting many of his statements of additional facts, Jackson relies on the affidavit of Isaac Williams. The Individual Defendants object to the Williams affidavit and urge the Court to strike or disregard it. Defendants argue the statements in the affidavit are inadmissible hearsay and are statements that "cannot be presented in a form that would be admissible in evidence" at trial, in violation of Rule 56(c)(2). This is because, Defendants say, neither Defendants nor Jackson were able to locate Williams to serve a deposition subpoena on him, and therefore he has not been subjected to cross-examination and there is no reason to believe that Williams would be available to testify as to the contents of his affidavit at trial.

In deciding a motion for summary judgment, a district court may consider any evidence that would be admissible at trial. *Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 460 (7th Cir. 2014). The evidence "need not be admissible in form, but must be admissible in content, such that, for instance, affidavits may be considered if the substitution of oral testimony for the affidavit statements would make the evidence admissible at trial." *Wheatley v. Factory Card & Party Outlet*, 826 F.3d 412, 420 (7th Cir. 2016). The Seventh Circuit has held that there is no cross-examination requirement for admission of a declaration at the summary judgment stage. *See Oto v. Metro. Life Ins. Co.*, 224 F.3d 601, 604–05 (7th Cir. 2000); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) ("Rule 56 does not require the non-moving party to depose her own witnesses."). All that is required is that a declaration be "made on personal knowledge, set out facts that would be admissible in evidence, and show that the [declarant] is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

The Court finds that it can consider the Williams affidavit. The affidavit contains many statements that would be admissible at trial through Williams's live testimony and complies with Rule 56. Although the Court does not doubt that Defendants diligently searched for Williams to depose him, it sees no way to determine, on the summary judgment record, whether Williams will be available at trial and therefore assumes that he will be.

In January 2023, Defendants indicated in a motion for extension of time to complete oral fact discovery that they still needed to depose Williams, "who both parties have been trying to locate and subpoena via a private investigator without success, notwithstanding diligent efforts." (ECF No. 57 ¶ 8.) However, Defendants did not seek the Court's assistance in locating Williams or compelling him to sit for a deposition. Defendants do not say they informed Jackson they would object to the use of Williams's affidavit at summary judgment if they were unable to find and depose him. Defendants may earnestly believe that Williams will be unavailable for trial, but, again, the Court is unable to reach that conclusion based on the record before it. Therefore, the Court will consider the Williams affidavit when ruling on Defendants' motion for summary judgment "to the extent it is about matters within [his] personal knowledge under the normal principle that [affidavits] may be used at summary judgment if their content can be admitted at trial in admissible form." *Blackmon v. City of Chicago*, No. 19 CV 767, 2023 WL 7160639, at *3 (N.D. Ill. Oct. 31, 2023) (citing *Wheatley*, 826 F.3d at 420).

## II.    Factual Background[1]

In resolving a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S.

---

[1] Jackson objects to many of the paragraphs in Defendants' statement of material facts, claiming they violate Local Rule 56.1(d)(1), which provides that statements of material facts "must consist of concise numbered paragraphs." L.R. 56.1(d)(1). True, many of Defendants' paragraphs contain

574, 587 (1986). The following facts are taken from the record and are undisputed unless otherwise noted.[2]

Between May 30 and June 24, 2009, Defendants and other members of a Chicago Police Department ("CPD") narcotics team investigated narcotics trafficking on and near the block of 4800 West Superior in Chicago. (DSOF ¶ 4.) The pertinent chronology of the investigation and related events is set forth below.

### May 30, 2009 Undercover Narcotics Purchase #1

The first undercover buy in the investigation occurred on May 30, 2009, at 10:15 a.m. (*Id.* ¶ 25.) Defendant Fleming, acting as the undercover officer ("UCO"), drove the block and caught the eye of an individual, later identified as Atlantis Jefferson, who waived for Fleming to pull over. (*Id.* ¶ 26.) Fleming requested heroin. (*Id.* ¶ 27.) Jefferson walked away and engaged another individual on a bicycle. (*Id.*) That individual rode away and returned to Fleming's vehicle with the drugs. (*Id.* ¶ 28.) Fleming paid him, and the individual gave Fleming the drugs. (*Id.*)

While driving away, UCO Fleming radioed nearby secondary surveillance officers and enforcement officers, one of whom was Defendant Calvo, indicating a positive transaction. (*Id.* ¶ 30.) Primary surveillance officer Defendant Dal Ponte did the same and provided a physical and clothing description of the two dealers. (*Id.* ¶ 31.)

---

multiple facts, but, in the Court's view, Defendants have not run afoul of Local Rule 56.1. There is no categorical prohibition of paragraphs containing multiple sentences or multiple facts. *See Eberly v. Harnack*, No. 19 CV 6129, 2022 WL 17668676, at *1 (N.D. Ill. Dec. 14, 2022). Defendants' paragraphs are concise, numbered, and logically grouped, and there is a citation to supporting evidence after each sentence. Thus, the Court overrules Jackson's boilerplate objections to those paragraphs which contain multiple facts. *See Nettles-Bey v. Burke*, No. 11 C 8022, 2015 WL 4638068, at *5 (N.D. Ill. Aug. 4, 2015) (concluding that the plaintiff properly combined sentences because "the sentences [were] all clearly interrelated so that it would make no sense to split them into separate paragraphs").

[2] The Court refers to the Individual Defendant's statement of material facts as "DSOF" (*see* ECF No. 92) and Plaintiff's statement of material facts as "PSOF" (*see* ECF No. 100).

*May 30, 2009 Undercover Narcotics Purchase #2*

Also on May 30, 2009, at 10:48 a.m., CPD conducted a second undercover heroin buy. (*Id.* ¶ 32.) Defendant UCO Eichman purchased heroin from the same two men. Jefferson walked up to Eichman, who requested drugs. (*Id.* ¶ 34.) Jefferson directed another individual who was on a bicycle, later identified as Isaac Williams, to the drugs. (*Id.*) This individual rode his bicycle out of sight. (*Id.*)

According to Defendants, after the individual on the bicycle left, Eichman observed another individual on a BMX bicycle.[3] (*Id.* ¶ 35.) This individual asked Eichman his name, to which Eichman responded, "Ike." (*Id.*) This individual then asked Eichman for his cell phone number, which Eichman provided.[4] (*Id.*)

After this conversation, Isaac Williams gave Eichman the drugs, and Eichman paid him. (*Id.* ¶ 36.) During this exchange, the individual asked Eichman what his name was and Eichman responded, "Ike." (*Id.* ¶ 37.) The individual then displayed his left forearm, which had an "Ike" tattoo, and exclaimed, "Hey, that's my name, too!" (*Id.*) Eichman later noted in his CPD Narcotics Purchasing Officer's Report for Williams, "Left forearm with tattoo 'Ike' just below it." (*Id.* ¶ 38.)

While driving away, Eichman radioed the narcotics team, including Defendants Dal Ponte and Calvo. (*Id.* ¶ 39.) Eichman radioed a positive transaction and provided a physical and clothing description of the two dealers. (*Id.*)

---

[3] Jackson denies Defendants' claim that he was the individual on the BMX bike and denies that there was a third individual present during the transaction, someone other than Williams and Jefferson. In his affidavit, Williams avers that he was the individual on the BMX bicycle who approached Eichman and traded phone numbers with him. Williams also attests that he had phone conversations with Eichman.

[4] Eichman did not document this conversation in his report.

While driving away, an unknown phone number called UCO Eichman's cell phone. (*Id.* ¶ 40.) When Eichman answered, the individual stated words to the effect of, "Put my number down if you need something." (*Id.*) Eichman understood the caller to be the individual to whom Eichman had just provided his cell number and saved this caller's phone number under the name "BMX." (*Id.* ¶¶ 40–41.)

### *May 30, 2009 Investigatory Stops*

Shortly after UCO Eichman's May 30 heroin buy, surveillance officers, who had kept eyes on the two heroin dealers the entire time, directed CPD enforcement officers to the dealers so they could be stopped and identified. Defendant Calvo, an enforcement officer, first stopped an individual who identified himself as Isaac Williams at 4646 W. Chicago Avenue. (*Id.* ¶ 42.) Calvo filled out a contact card for this stop, listing, *inter alia*, name (Isaac Williams), height (5' 8"), weight (160 pounds), DOB (*/*/1972), address (4815 W. Huron), and clothing (grey shirt and black pants). (*Id.* ¶ 43.) The contact card also noted that Williams, at the time of the investigatory stop, was "on bike." (*Id.*)

During this stop, Fleming and Eichman covertly and separately rode past the stop location in unmarked vehicles, and both independently identified Williams as an individual who sold them heroin minutes earlier. (*Id.* ¶ 44.)

Calvo then made a second stop, this one at 4841 W. Superior. (*Id.* ¶ 45.) The stopped individual identified himself as Atlantis Jefferson. (*Id.*) Calvo filled out a contact card, listing, *inter alia*, name (Atlantis Jefferson), height (6' 1"), weight (250 pounds), DOB (*/*/82), address (4840 W. Superior), and clothing (black jacket, white shirt, black jeans). (*Id.*) During this second investigatory stop, Fleming and Eichman covertly and separately rode past the stop location, and

both UCOs independently identified Jefferson as the other individual who sold them heroin that morning. (*Id.* ¶ 46.)

While stopping Jefferson, Calvo also stopped and filled out a third contact card for a man accompanying Jefferson at 4841 W. Superior. (*Id.* ¶ 47.) This individual identified himself as Plaintiff Ieliot Jackson. (*Id.*) Calvo filled out a contact card for this stop, listing, *inter alia*, name (Ieliot Jackson), height (6' 0"), weight (205 pounds), DOB (*/*/1982), home address, and clothing (green jacket, white shirt, and black pants). (*Id.*) Jackson does not dispute being stopped with Jefferson on May 30, 2009. (*Id.* ¶ 48.)

### *May 30, 2009 Photo Arrays*

Shortly after the May 30, 2009, investigatory stops, the narcotics team returned to the police station to document their undercover buys. (*Id.* ¶ 49.) There, the contact card information for Williams and Jefferson was used with CPD databases and CPD software to create four different five-pack photo arrays (two different ones containing a photo of Williams and two different ones containing a photo of Jefferson). (*Id.* ¶¶ 49–52.) When presented with the photo arrays, Eichman and Fleming each separately identified Williams and Jefferson as the individuals who sold them heroin that morning. (*Id.*) No photo array was made based on Jackson's contact card information.

### *June 2, 2009 Undercover Narcotics Purchase*

On June 2, 2009, CPD conducted a third undercover heroin buy. (*Id.* ¶ 53.) UCO Eichman drove down the block and observed an individual riding a bicycle. (*Id.* ¶ 54.) Eichman purchased drugs from this individual. (*Id.* ¶ 55.) Shortly after the transaction, surveillance directed Defendant Calvo to this individual, who Calvo then stopped. (*Id.* ¶¶ 56–57.) This individual identified himself as Tony Luster. (*Id.* ¶ 57.) Calvo filled out a contact card, listing, *inter alia*, name (Tony Luster),

height (5' 6"), weight (165 pounds), DOB (*/*/1971), address (736 N. Leclaire), and clothing (black jacket, orange shirt, blue jeans). (*Id.*)

While Luster was stopped, Eichman covertly rode past the stop location and positively identified Luster as the man who earlier sold him heroin. (*Id.* ¶ 58.) Later at the station, Luster's contact card information, CPD databases, and CPD software were used to create a five-pack photo array with Luster's photograph. (*Id.* ¶ 59.) When presented with the photo lineup, Eichman identified Luster as his heroin dealer from that afternoon. (*Id.*)

### June 4, 2009 Undercover Narcotics Purchase

Two days later, on June 4, 2009, CPD conducted a fourth undercover buy. (*Id.* ¶ 60.) Primary surveillance officer Ruiz parked on the 4800 W. Superior block. (*Id.* ¶ 61.) UCO Fleming drove the block and stopped at 4856 W. Superior, by an individual standing in the street. (*Id.*) This individual will be referred to as "Individual X" (Defendants claim this was Jackson; Jackson denies this). Fleming requested drugs from Individual X. (*Id.* ¶ 62.) Individual X called to another individual, who Fleming later identified as Luster. (*Id.*)

Luster walked away and returned moments later, showing Fleming drugs. (*Id.* ¶ 63) Pointing at Individual X, Luster indicated that "my guy" would sell them for $50. (*Id.*) Fleming then paid $50 in CPD pre-recorded "1505 funds" used for narcotics investigations to Luster who delivered the three bags of heroin. (*Id.*)

While driving away, Fleming radioed the team, including secondary surveillance officers Defendants Person and Dal Ponte and enforcement officer Defendant Calvo, that it was a positive transaction. (*Id.* ¶ 64.) Ruiz radioed the same information, along with a description of the sellers' appearance, clothing, and location. (*Id.*) Ruiz observed Luster hand the narcotics sale proceeds to Individual X. (*Id.* ¶ 65.)

A short time later, surveillance directed Defendant Calvo to an individual whom UCO Fleming claims he encountered during the undercover transaction (meaning Individual X). (*Id.* ¶ 66.) This stopped individual identified himself as Ieliot Jackson. (*Id.*) Calvo filled out a contact card, including, *inter alia*, name (Ieliot Jackson), height (6' 0"), weight (205 pounds), DOB (birth year 1982), address (154 N. Lotus), and description (green jacket, white shirt, and blue jeans). (*Id.*) During this stop, Calvo observed and documented that this individual possessed five $10 bills, the CPD pre-recorded 1505 funds used for the buy (Jackson denies that he possessed these funds because he had not sold drugs to CPD officers). (*Id.* ¶ 67.) Fleming covertly rode past in an unmarked car and identified the stopped individual as one of the men who sold him heroin that morning. (*Id.* ¶ 68.)

Later at the station, the contact card information for Jackson, CPD databases, and CPD software were used to create a five-pack photo array line up, which included a mug shot of Jackson from a February 2008 arrest. (*Id.* ¶ 69.) When presented with this photo array, Fleming positively identified Jackson's photo as one of the men who sold him heroin that morning. (*Id.*)

### June 5, 2009 Undercover Narcotics Purchase

The next day, June 5, CPD conducted a fifth heroin transaction. (*Id.* ¶ 70.) UCO Eichman purchased drugs from Williams, whom he knew and identified from his May 30, 2009 transaction. (*Id.* ¶¶ 71–73.)

### June 11, 2009 Undercover Narcotics Purchase

On June 11, 2009, CPD conducted its sixth buy. (*Id.* ¶ 75.) UCO Fleming drove the block and stopped his vehicle after making eye contact with an individual he recognized as the same man he had purchased heroin from on June 4—Individual X (whom Fleming had identified as Jackson).

(*Id.* ¶¶ 75–76.) Individual X approached Fleming, who then requested drugs. (*Id.* ¶ 77.) Individual X walked away and entered a vehicle that drove away. (*Id.*)

For safety reasons, Fleming left the area until primary surveillance officer Defendant Person indicated that Individual X had returned. (*Id.* ¶ 78.) Fleming then returned and parked at 4835 W. Superior. (*Id.*) Thereafter, Tony Luster walked to Fleming's vehicle and handed him the drugs. Fleming paid Luster $50 in CPD pre-recorded 1505 funds and drove away. (*Id.*)

While pulling away, UCO Fleming radioed the team, including enforcement officer Defendant Calvo and secondary surveillance officers Defendant Dal Ponte, Defendant Eichman, and Ruiz, that he conducted a positive deal with Individual X and Luster. (*Id.* ¶ 79.) After Fleming left, Defendant Person witnessed Luster count the CPD money and hand it to Individual X. Jackson denies selling drugs to Fleming on June 11, 2009. (*Id.*)

### *June 13, 2009 Undercover Narcotics Purchase*

Two days later, on June 13, 2009, CPD conducted its seventh buy. (*Id.* ¶ 81.) Shortly after 9:00 a.m., Eichman received a cell phone call from the phone number that Eichman had saved into his cell phone as "BMX" on May 30, 2009. (*Id.* ¶ 82.) Eichman asked to be "hooked up," and stated he would go to the location the caller gave him in about 30 minutes. (*Id.*)

At 9:39 a.m., UCO Eichman called the phone number back, and said he was five minutes away and needed drugs. (*Id.* ¶ 83.) Eichman then parked at 4856 W. Superior, just a couple of car lengths away from primary surveillance officer Defendant Person. (*Id.* ¶ 84.) Eichman called the phone number and stated he was on the block at the corner. (*Id.*) Shortly thereafter, Eichman and Person observed a man walk towards Eichman's vehicle. (*Id.* ¶ 85.) Person recognized the individual as Jackson from the June 11 sale (Jackson denies he made either sale). (*Id.*) Eichman purchased drugs from the individual. (*Id.*) Eichman recognized the individual as the man who was

on a BMX bicycle whom Eichman interacted with on May 30 (and who Jackson claims was Williams, not him). (*Id.* ¶ 86.) While driving away, Eichman reported a positive transaction and provided a physical, clothing, and location description via radio. (*Id.* ¶ 87.) In response, Defendant Person reported via radio that the seller had previously sold narcotics to Fleming on June 4 and June 11 (Individual X, whose identity the parties dispute) and so had been previously stopped and identified. (*Id.*)

Later at the station, a five-pack photo array was created that included a mugshot of Jackson from a June 11, 2009 arrest. (*Id.* ¶ 88.) When presented with this lineup, Eichman positively identified Jackson as the man who sold him heroin that afternoon. (*Id.*)

Jackson denies selling drugs to Eichman on June 13, 2009, and Williams has averred that he sold the drugs to Eichman that day and that he was the individual Eichman spoke with over the phone on June 13, 2009.

### June 17, 2009 Undercover Narcotics Purchase

On June 17, 2009, Fleming again purchased heroin from the individual that UCO Fleming and UCO Eichman claimed to have previously identified as Jackson. (*Id.* ¶ 89.) Defendant Dal Ponte was primary surveillance, parked on the block of 4800 W. Superior. (*Id.* ¶ 90.) Fleming drove the block and observed the individual previously identified as Jackson sitting in a vehicle. (*Id.*) The individual approached the vehicle and Fleming asked for drugs. (*Id.* ¶ 91.) The individual then went to his vehicle but returned and asked for a ride. (*Id.*) Fleming agreed. (*Id.* ¶ 92.) When they arrived at the destination, the individual asked Fleming for the money, left the car, and returned with the requested drugs. (*Id.*) While pulling away, Fleming radioed the team that he conducted another buy with the individual previously identified as Jackson. (*Id.* ¶ 93.)

Jackson denies selling drugs to Fleming on June 17, 2009.

**Jackson's Arrest**

By late June 2009, team leader Defendant Sergeant Santos concluded that there was probable cause to arrest Jackson, Williams, Jefferson, and Luster, end the narcotics investigation, and initiate arrests, which were carried out on June 24, 2009. (*Id.* ¶ 94.) For Jackson, Defendant Dal Ponte was the primary arresting officer and Defendant Calvo was the secondary arresting officer and attesting officer for the arrest report. (*Id.* ¶ 95.)

**Jackson's Criminal Prosecution**

On June 25, 2009, Defendants Fleming and Eichman swore out four separate criminal complaints against Jackson, one for each of Jackson's alleged heroin sales on June 4, June 11, June 13, and June 17, 2009. (*Id.* ¶ 98.) One year later, in July 2010, Jackson proceeded to a jury trial on the alleged June 13 sale only. (*Id.* ¶ 99.) Eichman and Person were the only two Individual Defendants that testified at the trial. (*Id.*) During their testimony, Defendants Eichman and Person both identified Jackson as the June 13 heroin dealer. (*Id.* ¶ 100.) The June 13 photo line-up in which Eichman identified Jackson was also admitted into evidence. (*Id.*) Prosecutors also admitted forensic evidence that bags sold on June 13 contained heroin and that the sale occurred within 1,000 feet of a school. (*Id.* ¶ 101.) Jackson presented no alibi or other defense witness. (*Id.* ¶ 102.) The jury convicted Jackson. (*Id.* ¶ 103.) With Jackson proceeding *pro se* for his post-trial proceedings, the court sentenced Jackson to thirteen years of incarceration. (*Id.*)

A series of post-trial motions and appeals ensued. On March 16, 2016, Jackson was released from custody and placed on parole while Jackson's post-trial motion for ineffective assistance of trial counsel was pending. (*Id.* ¶ 110.)

In September 2018, the trial court held Jackson's criminal defense counsel ineffective following an evidentiary hearing. (*Id.* ¶ 111.) The court therefore vacated Jackson's conviction

and ordered a new trial. (*Id.*) In October 2018, the state's attorney chose not to re-prosecute him, and the charges against him were dismissed. (*Id.* ¶ 112.)

On December 16, 2019, the circuit court granted Jackson a Certificate of Innocence, which stated that Jackson "is innocent of the offenses charged in the indictment." (PSOF ¶ 48.)

This lawsuit followed. Jackson brings claims against the Individual Defendants under 42 U.S.C. § 1983 for violations of his Fourth and Fourteenth Amendment rights, alleging false arrest, fabrication of evidence, concealment of favorable evidence, conspiracy, and failure to intervene. Jackson argues, among other things, that he never sold drugs to Eichman or Fleming or possessed CPD 1505 funds in 2009, and never sold drugs with, and did not know, Tony Luster before being arrested on June 24, 2009. The Individual Defendants now move for summary judgment on all claims asserted against them.

Jackson also brings *Monell* claims, as well as claims for *respondeat superior* liability and indemnification, against the City of Chicago. The Court previously granted the City's motion to bifurcate and stay discovery and trial on the *Monell* claims, so they are not part of the City's pending motion for summary judgment. (ECF No. 52.) The City now moves for summary judgment as to Jackson's *respondeat superior* and indemnification claims.

## Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex*, 477 U.S. at 322–23. To defeat summary judgment, a nonmovant must produce more than a "mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 894, 896 (7th Cir. 2018). The Court considers the entire evidentiary record and must view all of

the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Horton v. Pobjecky*, 883 F.3d 941, 948 (7th Cir. 2018). The Court does not "weigh conflicting evidence, resolve swearing contests, determine credibility, or ponder which party's version of the facts is most likely to be true." *Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 760 (7th Cir. 2021). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## Discussion

### I.   False Arrest (Count I)

Jackson's false arrest claim is brought against Defendants Eichman, Fleming, and Calvo only.[5] Defendants argue summary judgment is warranted because Jackson's false arrest claim is time-barred. At the motion to dismiss stage, the Court held that the statute of limitations did not begin to run until the criminal proceedings terminated in Jackson's favor. Specifically, the Court found that "[a]ny legal challenge to Jackson's Fourth Amendment claim 'would have automatically implicated the validity of [Jackson's] criminal convictions because both injuries are premised on the same set of facts.'" (ECF No. 35 at 9 (quoting *Serrano v. Guevara*, No. 17 CV 2869, 2020 WL 3000284, at *18 (N.D. Ill. June 4, 2020)).)

Defendants accuse the Court of erring by treating Jackson's Fourth Amendment false arrest claim like a "post-legal-process Fourth Amendment claim." (ECF No. 87 at 15.) Defendants are correct that these are two distinct claims. Defendants contend—and Jackson does not argue to the contrary—that Count I's Fourth Amendment claim is focused on the arrest itself, rather than the

---

[5] Jackson agreed to dismiss the false arrest claim as to Defendant Dal Ponte. (*See* ECF No. 91 at 2.)

detention and prosecution that followed the arrest. (*See* ECF No. 87 at 18 (citing examples from the complaint).) The Court agrees.

The statute of limitations on a claim for false arrest begins to run when the plaintiff is first detained pursuant to legal process. *Wallace v. Kato*, 549 U.S. 384, 397 (2007) ("[W]here the arrest is followed by criminal proceedings, [the statute of limitations] begins to run at the time the claimant becomes detained pursuant to legal process."); *see also Regains v. City of Chicago*, 918 F.3d 529, 533 (7th Cir. 2019) ("A claim for false arrest or false imprisonment accrues once the plaintiff is detained (or released) as a result of a lawful process."). The prospect that charges will be filed, and a conviction ensue, does not postpone the claim's accrual. *Wallace*, 549 U.S. at 393.

Jackson relies on *Heck v. Humphrey*, 512 U.S. 477 (1994), which held that a claim under § 1983 does not accrue if it would necessarily imply the invalidity of the related criminal conviction. The Supreme Court has underscored that a close relationship is essential: "[W]e were careful in *Heck* to stress the importance of the term 'necessarily.'" *Nelson v. Campbell*, 541 U.S. 637, 647 (2004) (citing *Heck*, 512 U.S. at 487 n.7). "[A] wrongful arrest claim does not necessarily undermine a conviction" as "one can have a successful wrongful arrest claim and still have a perfectly valid conviction." *Wiley v. City of Chicago*, 361 F.3d 994, 997 (7th Cir. 2004) (internal quotation marks and citation omitted). But "where the grounds for the conviction flow from the same facts underlying the allegations of false arrest, the claim is barred by *Heck*." *Szach v. Vill. of Lindenhurst*, No. 14 C 7441, 2015 WL 3964237, at *6 (N.D. Ill. June 25, 2015) (collecting cases); *see also Wallace*, 549 U.S. at 393 (contemplating that some false arrest claims will be *Heck*-barred).

Here, the probable cause for Jackson's arrest was also the basis for his conviction. Jackson insists the arrest was wrongful because he never sold drugs to the undercover officers. If Jackson

had filed his false arrest claim within two years following his arrest, and the claim was allowed to go forward, a federal jury would have been required to choose between (1) Jackson's claim that the police lacked probable cause to think that Jackson had committed any crimes and (2) the state court jury's determination, affirmed by the Illinois Appellate Court, that Jackson had committed the very crimes for which he was arrested. "This is exactly what *Heck* is meant to prevent." *Fields v. Griffith*, No. 1:19cv25, 2020 WL 2559642, at *4 (N.D. Ind. May 20, 2020).

So, a finding that the police lacked probable cause to arrest Jackson would necessarily imply the invalidity of his conviction that was based on that same evidence and testimony, and the Court likely would have been required to dismiss Jackson's false arrest claim as being *Heck*-barred. *See*, *e.g.*, *Johnston v. Devries*, No. 21-2679, 2022 WL 476088, at *2 (7th Cir. Feb. 16, 2022) ("Here, the facts alleged by Johnston—that the police officers lacked probable cause to arrest him because the 911 call was fabricated, and that the witness at the bank gave false testimony—call into question the validity of his underlying criminal conviction."), *cert. denied*, 142 S. Ct. 2744 (2022); *Puch v. Vill. of Glenwood, Ill.*, No. 05 C 1114, 2012 WL 2502688, at *4 (N.D. Ill. June 27, 2012) (because the plaintiff had been convicted based on the testimony of the arresting officer, which was the same testimony supporting probable cause, the plaintiff could not prevail on the false arrest claim without undermining the criminal conviction); *Rollins v. Willett*, 770 F.3d 575, 576–77 (7th Cir. 2014) ("So suppose a defendant convicted of possessing illegal drugs found on his person sued the officer who had found the drugs, alleging that the officer planted them. If he won the suit, it would imply the invalidity of his drug conviction. The suit would therefore be barred by the rule of *Heck v. Humphrey*.").

In *Wallace*, the Supreme Court recognized a "complication" in applying the *Heck* bar to claims like Jackson's that "arises from the fact that § 1983 actions . . . sometimes accrue before

the setting aside of—indeed, even before the existence of—the related criminal conviction." 549 U.S. at 394 (internal citation omitted). As the Court explained, application of *Heck* to such claims "raises the question whether, assuming that the *Heck* bar takes effect when the later conviction is obtained, the statute of limitations on the once valid cause of action is tolled as long as the *Heck* bar subsists." *Id.* There, like here, "[i]f petitioner's conviction . . . caused the statute of limitations on his (possibly) impugning but yet-to-be-filed cause of action to be tolled until that conviction was set aside, his filing [] would have been timely." *Id.*

Finding no basis for tolling under Illinois state law, the Court declined to adopt a federal equitable tolling rule in such circumstances. *Id.* The Court reasoned that "[u]nder such a regime, it would not be known whether tolling is appropriate by reason of the *Heck* bar until it is established that the newly entered conviction would be impugned by the not-yet-filed, and thus utterly indeterminate, § 1983 claim. It would hardly be desirable to place the question of tolling *vel non* in this jurisprudential limbo, leaving it to be determined by those later events, and then pronouncing it retroactively." *Id.* at 394–95 (internal footnote omitted).

Related to this discussion, the Supreme Court addressed a similar scenario to Jackson's and observed the following:

> Had petitioner filed suit upon his arrest and had his suit then been dismissed under *Heck*, the statute of limitations, absent tolling, would have run by the time he obtained reversal of his conviction. If under those circumstances he were not allowed to refile his suit, *Heck* would produce immunity from § 1983 liability, a result surely not intended. Because in the present case petitioner did not file his suit within the limitations period, we need not decide, had he done so, how much time he would have had to refile the suit once the *Heck* bar was removed.

*Wallace*, 549 U.S. at 395 n.4. Accordingly, if Jackson raised his claim within two years following his arrest and the claim was dismissed as being *Heck*-barred, he would be able to refile the claim if he later succeeded in overturning his conviction, as he eventually did. *See Ellis v. City of*

17

*Chicago*, No. 13 CV 2382, 2016 WL 212489, at *6 (N.D. Ill. Jan. 19, 2016). But Jackson still needed to raise his false arrest claim within the limitations period, which he did not do.

Jackson's false arrest claim therefore is untimely. The Court grants summary judgment in Defendants' favor on the false arrest claim.

## II.    Due Process (Count II)

### a.    Fabrication of Evidence

Jackson alleges that Eichman and/or Santos[6] knowingly fabricated the photo array evidence used to convict Jackson for the alleged drug transaction on June 13, 2009. "Because falsified evidence never helps a jury perform its truth-seeking function, 'convictions premised on deliberately falsified evidence will always violate the defendant's right to due process.'" *Brown v. City of Chicago*, 633 F. Supp. 3d 1122, 1156 (N.D. Ill. 2022) (quoting *Avery v. City of Milwaukee*, 847 F.3d 433, 439 (7th Cir. 2017)); *see also Coleman v. City of Peoria*, 925 F.3d 336, 344 (7th Cir. 2019) ("Using false evidence to convict violates a defendant's right to a fair trial guaranteed by the Fourteenth Amendment's Due Process Clause.").

To prevail on his fabrication-of-evidence claim, Jackson must establish that: (1) Eichman and/or Santos deliberately and knowingly fabricated evidence; (2) evidence was used at Jackson's criminal trial; (3) the trial evidence was material; and (4) Jackson was damaged by the evidence's admission at trial. *Brown*, 633 F. Supp. 3d at 1156. At summary judgment, a plaintiff "need not have a smoking gun or an admission to prove knowledge." *Gray v. City of Chicago*, No. 18 C 2624, 2022 WL 910601, at *10 (N.D. Ill. Mar. 29, 2022). Rather, he must "offer sufficient evidence

---

[6] Jackson's fabrication-of-evidence claim is against Defendants Eichman and Santos only. To the extent any other Defendants were arguably implicated in the pleadings, they are entitled to summary judgment as to the fabrication-of-evidence claim.

from which a reasonable jury could find that the Individual Defendants knew the evidence they were eliciting was false." *Id.*

It is undisputed that the photo array was a material piece of evidence at trial and that its admission was damaging to Jackson. So, Jackson must come forth with evidence showing Eichman and Santos "created evidence that they knew with certainty to be false." *Anderson v. City of Rockford*, 932 F.3d 494, 510 (7th Cir. 2019).

As for Eichman, a reasonable jury could accept Jackson's version of events—that it was Williams, not Jackson, who was on a BMX bike and sold Eichman drugs on June 13, and Eichman, having encountered and identified Williams during prior drug transactions, knew the difference between Williams and Jackson and intentionally misidentified Jackson in the photo array. *See Brown*, 633 F. Supp. 3d at 1157 ("At summary judgment, a plaintiff need not have a smoking gun or an admission to prove knowledge." (internal quotation marks and citation omitted)). "[N]o matter how tempting it might be on summary judgment to be distracted by the sparkle of seemingly compelling facts, our assigned task is to take the facts in the light most favorable to the non-moving party." *Stewart*, 14 F.4th at 760. Though Jackson's arguments rely on circumstantial inferences, it is best left to the jury to resolve the conflicting evidence and testimony as to Eichman. Therefore, Defendant Eichman is not entitled to summary judgment on the fabrication claim. *See Jackson v. Duckworth*, 955 F.2d 21, 22 (7th Cir. 1992) ("summary judgment is not a procedure for resolving a swearing contest").

As for Defendant Santos, Defendants first argue that the creator of the June 13 photo array where Eichman identified Jackson is unknown. However, Eichman specifically testified that Santos created the photo array, which Defendants acknowledge—the Court therefore assumes Santos created the photo array. (PSOF ¶ 27.)

Defendants also argue there is no evidence that Santos himself made the decision to include Jackson in the June 13 photo array. Instead, they claim Person identified Jackson for Santos to include him in the array. Specifically, Person told Santos that the person involved in the June 13 drug sale was the same one who had made the June 4 and June 11 sales (meaning Individual X, who had been identified as Jackson). Defendants say Jackson has not presented any evidence that Santos deliberately falsified the photo array by including a photo of Jackson even though he knew Jackson was not the suspect, or that Santos "knew with certainty" that Eichman's identification was "false" in light of this. Jackson counters that because Santos was the team leader on both May 30 and June 13, "[i]t therefore is reasonable to infer that Defendant Santos knew that Mr. Williams was the drug seller when he [Santos] created the photo array which included a photo of Mr. Jackson but not a photo of Mr. Williams." (ECF No. 91 at 10.) However, there is no evidence that Santos saw any of the undercover transactions take place. Instead, as sergeant, Santos would have been nearby and monitoring via radio for decision-making and safety purposes, but "would not have 'eyes on' the attempted undercover transaction." (DSOF ¶ 11.)

Thus, there is no evidence from which a reasonable jury could conclude that Santos knew that the person involved in the June 13 transaction was Williams, not Jackson, particularly after Person identified the individual as having been involved in the June 4 and June 11 transactions, meaning Jackson. Thus, even if Santos knew what Jackson and Williams looked like, the evidence does not support that Santos knew that Williams, rather than Jackson, was the correct person to include in the June 13 photo array or that Eichman wrongly identified Jackson. Santos therefore is entitled to summary judgment as to Jackson's fabrication claim.

### b. Qualified Immunity

Defendants argue that Santos and Eichman are entitled to qualified immunity for Jackson's fabrication-of-evidence claim. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "In general, once the defendants raise the qualified immunity defense, the plaintiff must show two things: first, that there has been a violation of one or more of [his] federal constitutional rights, and second, that the constitutional standards at issue were clearly established at the time of the alleged violation." *Campbell v. Peters*, 256 F.3d 695, 699 (7th Cir. 2001) (citation omitted).

The law is "clearly established" when "various courts have agreed that certain conduct is a constitutional violation under facts not distinguishable in a fair way from the facts presented in the case at hand." *Id.* at 701 (cleaned up). The right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established. *Id.* (internal quotation marks omitted) (quoting *Wilson v. Layne*, 526 U.S. 603, 615 (1999)). Nonetheless, "general statements of the law are not inherently incapable of giving fair and clear warning, and in [certain] instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002); *see also Figgs v. Dawson*, 829 F.3d 895, 906 (7th Cir. 2016) ("While, to be clearly established, a right must be specific to the relevant factual context of a cited case and not generalized with respect to the Amendment that is the basis of the claim, the very action in question need not have previously been held unlawful for a public official to have reasonable notice of the illegality of some action." (cleaned up)).

Defendant's motion as to qualified immunity for Santos is denied as moot given the Court's grant of summary judgment in Santos's favor on the merits. *See Cunningham v. Figolah*, 102 F. App'x 59 (7th Cir. 2004); *Chicago United Indus., Ltd. v. City of Chicago*, 685 F. Supp. 2d 791, 794 (N.D. Ill. 2010) ("Having granted summary judgment on the merits of all of CUI's remaining claims, Defendants Dempsey and Langone's motion for summary judgment based on qualified immunity . . . is denied as moot."), *aff'd*, 669 F.3d 847 (7th Cir. 2012).

As to Eichman, Jackson presents sufficient evidence from which a reasonable jury could infer Eichman fabricated evidence used against him at trial. Because fabrication of evidence violates "clearly established constitutional rights," qualified immunity does not apply. *See, e.g.*, *Dominguez v. Hendley*, 545 F.3d 585, 589 (7th Cir. 2008) (stating that "withholding material exculpatory evidence from the defense and prosecutor, orchestrating a show-up identification procedure that caused the criminal trial to be unfair, and fabricating evidence against" the defendant is conduct that undisputedly "violates clearly established constitutional rights."); *Pyle v. Kansas,* 317 U.S. 213, 216 (1942) (knowing use of fabricated evidence to secure a criminal conviction violates constitutional rights); *Whitlock v. Brueggemann*, 682 F.3d 567, 585 (7th Cir. 2012) (the deliberate manufacture of false evidence contravenes the Due Process Clause); *Jones v. City of Chicago*, 856 F.2d 985, 993 (7th Cir. 1988) (fabricating evidence violates constitutional rights).

### c. Concealed Evidence

To prevail on a civil *Brady*-based due process claim against a police officer, a plaintiff must demonstrate that the evidence in question was favorable to him, the police "suppressed" the favorable evidence, and prejudice ensued because the suppressed evidence was material. *See Carvajal v. Dominguez*, 542 F.3d 561, 566–67 (7th Cir. 2008); *see also Cairel v. Alderden*, 821

F.3d 823, 832 & n.2 (7th Cir. 2016). Evidence is suppressed for *Brady* purposes if the "prosecution failed to disclose evidence that it or law enforcement was aware of before it was too late for the defendant to make use of the evidence" and "the evidence was not otherwise available to the defendant through the exercise of reasonable diligence." *Boss v. Pierce*, 263 F.3d 734, 740 (7th Cir. 2001).

Jackson argues that Defendants[7] all knew who Williams was prior to June 13, 2009, and were all present when Williams sold Eichman drugs on June 13. Jackson says the "mandatory inference" from these facts is that Defendants "concealed evidence" that it was Williams, not Jackson, who sold the drugs on June 13. But Jackson does not identify a specific piece of evidence that was concealed. Rather, his contention seems to be that Defendants should have admitted they lied about Jackson being the June 13 drug dealer, and by failing to do so, Defendants suppressed exculpatory evidence in violation of Jackson's due process rights. (*See* ECF No. 91 at 14 ("Plaintiff's concealment of evidence claim against [Defendants] is that they concealed evidence that the correct identification of the person who sold drugs to Defendant Eichman on June 13, 2009 was Isaac Williams.").)

The Seventh Circuit, however, does not permit recasting evidence-fabrication claims as *Brady*-based due process claims. In essence, Jackson "seeks to charge the officers with a *Brady* violation for keeping quiet about their wrongdoing," or lying about what they observed, and "not for failing to disclose any particular piece of *evidence* to the prosecution." *Saunders-El v. Rohde*, 778 F.3d 556, 562 (7th Cir. 2015) (emphasis in original); *see also Harris v. Kuba*, 486 F.3d 1010, 1017 (7th Cir. 2007). And "*Brady* does not require the creation of exculpatory evidence, nor does

---

[7] Jackson agrees to dismiss the concealment of evidence claim against Defendant Dal Ponte. (*See* ECF No. 91 at 15 n.2.)

it compel police officers to accurately disclose the circumstances of their investigations to the prosecution." *Id.* Moreover, because Jackson knew he did not sell the drugs, he knew enough to pursue evidence of the actual drug dealer, and nothing suggests that such an avenue of investigation was closed off to him. Defendants are entitled to summary judgment on the concealed-evidence claim.

### III.    Conspiracy (Count III)

To prove a § 1983 conspiracy, a plaintiff must show that multiple people reached an agreement to deprive him of a constitutional right, an overt act in furtherance of the conspiracy, and that the acts deprived the plaintiff of the constitutional right. *Beaman v. Freesmeyer*, 776 F.3d 500, 510 (7th Cir. 2015). Circumstantial evidence can prove an agreement since conspiracies often do not depend on explicit agreements, but evidence must be more than merely speculative. *Id.* at 511. Here, though a jury could infer from the record that Jackson's identification was fabricated by Defendant Eichman, Jackson lacks evidence that anyone besides Eichman was involved or conspired to violate Jackson's rights—Plaintiff instead merely speculates there was a conspiracy because Defendants worked together, which does not defeat summary judgment. *See Carmody v. Bd. of Trs. of Univ. of Ill.*, 893 F.3d 397, 401 (7th Cir. 2018) ("[I]nferences that are supported by only speculation or conjecture will not defeat a summary judgment motion."); *LaSalle Bank Lake View v. Seguban*, 937 F. Supp. 1309, 1325 (N.D. Ill. 1996) ("[I]t takes two to form a conspiracy."). The Court therefore grants Defendants' motion for summary judgment as to the conspiracy claims against Defendants.

### IV.    Failure to Intervene (Count IV)

A police officer who fails to intervene to prevent another law enforcement officer from violating a plaintiff's constitutional rights can be held liable under § 1983 if the plaintiff can

establish that the police officer: "(1) had reason to know that a fellow officer was using excessive force or committing a constitutional violation, and (2) had a realistic opportunity to intervene to prevent the act from occurring." *Lewis v. Downey*, 581 F.3d 467, 472 (7th Cir. 2009); *see also Abdullahi v. City of Madison*, 423 F.3d 763, 774 (7th Cir. 2005).

Because an officer cannot fail to intervene in his own conduct, the failure-to-intervene claims against Defendant Eichman must be dismissed. *See Thompson v. Vill. of Monee*, No. 12 C 5020, 2013 WL 3337801, at *13 (N.D. Ill. July 1, 2013) (dismissing failure-to-intervene claim because officer-defendant "cannot possibly intervene to stop his own conduct"). Defendants' motion for summary judgment is also granted as to the other Individual Defendants. Jackson's argument in support of this claim is undeveloped; all Jackson argues is that the Individual Defendants worked together to violate his constitutional rights, and therefore the Individual Defendants "knew that the constitutional violations were being committed and had a realistic opportunity to prevent the violations but failed to do so." (ECF No. 91 at 16.) Without offering any material supporting evidence, Jackson's speculation is not enough to avoid summary judgment on this claim. *See Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) ("[S]ummary judgment requires a non-moving party to respond to the moving party's properly-supported motion by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial." (internal quotation marks and citation omitted)).

## V.     *Respondeat Superior* and Indemnification (Counts VII and VIII)

The Court grants in part and denies in part the City of Chicago's motion for summary judgment as to Jackson's *respondeat superior* and indemnification claims. The City is entitled to summary judgment on Jackson's *respondeat superior* claim because a municipality cannot be held liable for the constitutional torts of its employees and agents, and Jackson points to no authority

or reasoning to the contrary. *See First Midwest Bank Guardian of Estate of LaPorta v. City of Chicago*, 988 F.3d 978, 986 (7th Cir. 2021). Count VII thus is dismissed.

However, the City is not entitled to summary judgment on Jackson's indemnification claim because Jackson's fabrication-of-evidence claim against Eichman survives summary judgment. *See Walker v. City of Chicago*, 596 F. Supp. 3d 1064, 1076 (N.D. Ill. 2022) ("Because the fabricated-evidence claim survives against the individual Defendants, the indemnification claim survives too.").

## <u>Conclusion</u>

The Court grants in part and denies in part the Individual Defendants' motion for summary judgment (ECF No. 86) and grants in part and denies in part the City of Chicago's motion for summary judgment (ECF No. 83). The Court dismisses Jackson's false-arrest, concealment-of-evidence, conspiracy, failure-to-intervene, and *respondeat superior* claims, and dismisses Jackson's fabrication-of-evidence claim against Santos. Jackson's other claims remain pending.

The Court sets a telephonic status hearing for April 4, 2024 at 9:30 a.m. The parties shall submit a joint status report addressing how this case should proceed by April 1, 2024.

**SO ORDERED.**                    **ENTERED: March 15, 2024**

_____
**HON. JORGE ALONSO**
**United States District Judge**

26